------------------------------------------------------------------------ x

DEZMINE WELLS,

                    Plaintiff,

          v.

XAVIER UNIVERSITY and FATHER MICHAEL J. GRAHAM,

                 Defendants.

------------------------------------------------------------------------ x

    13-cv-575 (SAS) (SKB)

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Dezmine Wells, by his attorneys, Peter R. Ginsberg Law, LLC and Merlyn D. Shiverdecker, for his Amended Complaint against Defendant Xavier University ("Xavier") and Xavier's President, Father Michael J. Graham, alleges as follows:

## NATURE OF THE ACTION

1.     By this action, Wells seeks to recover damages for, *inter alia*, Xavier's breach of contract arising out of Xavier's failure to follow its own policies and procedures regarding student disciplinary actions and its and Father Graham's wanton failure to abide by the duty and obligation to adhere to such policies and procedures in a good faith, professional and regular, unbiased manner.

2.     Wells is a former Xavier student-athlete and member of the Xavier men's basketball team during the 2011-2012 Season.

3.     In July 2012, Wells was falsely accused of sexual assault.  The Xavier University Conduct Board ("UCB"), charged with adjudicating the allegations against Wells, failed to follow Xavier's policies for disciplinary proceedings, conducted a fundamentally unfair hearing, and defamed Wells by publicly proclaiming him guilty of rape, materially as a result of Father Graham's irresponsible and reckless rush to judgment.

4.     Wells is entitled to have the UCB's decision vacated and to actual and punitive damages for Xavier's false, malicious and injurious actions and statements.

**JURISDICTION AND VENUE**

5.     This Court has jurisdiction over Wells' claims pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States. This Court also has jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1367 because the claims either involve questions arising under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88 ("Title IX") or are state law claims arising out of the same transaction or occurrences giving rise to Plaintiff's federal law claims.

6.     Wells is a citizen of the State of North Carolina and a University of Maryland ("Maryland") men's basketball student-athlete.

7.     Xavier is a private Jesuit university located in Cincinnati, Ohio.  Xavier is an Ohio non-profit corporation.

8.     This Court has personal jurisdiction over Xavier pursuant to Rule 4(c) of the Federal Rules of Civil Procedure and Ohio Rev. Code Ann. § 2307.382(A)(3).

9.     Xavier, *inter alia*, transacts business in Ohio and caused a tortious injury by an act that occurred in Ohio.

10.     Father Graham is the President of Xavier and, upon information and belief, a citizen of the State of Ohio.

11.     This Court has personal jurisdiction over Father Graham pursuant to Rule 4(c) of the Federal Rules of Civil Procedure.  Father Graham is a resident of Ohio.

12.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) and (b)(3).

# BACKGROUND

*Wells' Background*

13.     Wells grew up in Raleigh, North Carolina with his mother and two sisters.

14.     Wells was a decorated student-athlete in high school, a member of two state championship basketball teams, and was recruited by many universities throughout the country towards the end of high school.

15.     In November 2010, Wells signed a national letter of intent to attend Xavier.

*False Allegations Against Wells*

16.     In the early morning of July 7, 2012, Wells engaged in consensual sex with Kristen Rogers, a Xavier upperclassman and Wells' Resident Advisor.  The sex occurred after several hours of Wells, Rogers and several of their friends, male and female, hanging out in Wells' dormitory room.

17.     During the night, the group played the game "truth or dare." The women participated actively and willingly.

18.     Many of the dares were sexual in nature and included Rogers giving Wells a lap dance, Rogers lifting up her shirt and exposing her breasts, and Rogers removing her pants. Rogers engaged in all such activities voluntarily.

19.     During the "truth or dare" game, Rogers kissed Wells several times.

20.     Towards the end of the evening, Wells accompanied Rogers back to her dorm room at Rogers' invitation.

21.     Upon entering Rogers' room, Rogers and Wells began to kiss and undress, at which point Rogers asked Wells if he had a condom.

22.     Wells and Rogers thereafter engaged in consensual sexual intercourse.

23. Following intercourse, Wells and Rogers returned to Wells' room to retrieve Rogers' cellular telephone at approximately 5:15 A.M. According to multiple witnesses, Rogers' demeanor was completely normal when she retrieved her telephone.

24. On July 7, 2012, Rogers claimed to Xavier campus police that Wells had sexually assaulted her.

25. A campus police officer instructed Rogers not to use the restroom in order to maintain the accuracy of a medical examination. Rogers ignored the officer's advice and used the restroom.

26. The officer then escorted Rogers to University Hospital at the University of Cincinnati where Rogers was examined for sexual assault. The examination revealed that Rogers had not suffered any trauma from the intercourse with Wells.

27. The Prosecuting Attorney's Office shortly thereafter confirmed that Rogers had not been sexually assaulted.

28. On July 12, 2012, Wells was informed by Xavier campus police that Rogers had accused Wells of rape.

*Xavier Student Handbook*

29. The Xavier Student Handbook ("Handbook") sets forth Xavier's policies and procedures for the UCB's adjudication of "cases considered to be of the most serious nature," including allegations of sexual assault and rape.

30. The Dean of Students is authorized to assign cases involving allegations of serious student misconduct to the UCB. The UCB is empowered to hold hearings to determine whether violations of Xavier's policies have occurred.

31.     The UCB is comprised of eight faculty members, four administrators, and ten students with sanctioning authority up to and including dismissing students from Xavier.  The Handbook requires UCB members to be trained and experienced in adjudicating such matters and to be free of prejudice or bias.

32.     The Handbook's policies, mandated to "preserve fundamental fairness, "include several procedural requirements, including but not limited to the following:

> a.  The UCB must use a "preponderance of the evidence" standard, which mandates a finding of responsibility when the "greater weight of the evidence (more than 50%) supports such a finding";
>
> b.  Parties are prohibited from having legal representation at the hearing;
>
> c.  The Administrative Hearing Officer or UCB Chairperson "may reasonably limit the scope and time devoted to each case or item of discussion during the hearing, as well as the number of persons testifying or providing witness material";
>
> d.  Witnesses may testify at the hearing only if they have "knowledge directly related to the pending charges";
>
> e.  The UCB may dismiss witnesses from the hearing if testimony is based on opinion or perceived character alone; and

33.     UCB members are required to receive "training on relevant topics [concerning rape allegations] and [be] equipped to conduct hearings where the complainant may present his or her case and the respondent has an opportunity to defend him or herself."

*Xavier's History of Mishandling Sexual Assault Allegations*

34.     In January 2012, the United States Education Department's Office of Civil Rights ("OCR") opened an investigation into Xavier's handling of two alleged sexual assault cases in 2008 and 2009.

35.     OCR's investigation focused on allegations that Xavier allowed a male student accused of sexual assault to remain on campus after an alleged assault, without regard to the rights of two women who claimed to have been sexually assaulted by the male student.

36.     In February 2012, OCR opened an additional investigation into Xavier's handling of a third alleged sexual assault case.  OCR conducted an extensive investigation of the three incidents.

37.     On August 1, 2012, Xavier announced that, pursuant to an agreement with OCR, it would establish training and reporting programs designed to protect victims of sexual assault and harassment.  Xavier also agreed to pay for counseling for one of the women who claimed she had been sexually assaulted and to ensure her safety on campus.

*The Prosecutor's Office Begins an Investigation*

38.     Rogers initially made her accusation to Xavier's campus police.

39.     A few days after the alleged assault, Rogers met with Cincinnati police but later informed Cincinnati police that she did not want to press charges.

40.     Despite Rogers' decision to not proceed with charges against Wells, Hamilton County (Ohio) Prosecutor Joseph T. Deters began an investigation into the alleged sexual assault.

41.     Deters developed serious concerns about the truthfulness of Rogers' allegations based upon a professional and thorough review of the matter by trained experts.

42. Deters attempted to communicate these serious concerns directly to Father Graham and, when Father Graham failed and otherwise refused to return Deters' messages, Deters communicated these serious concerns to another Xavier official and asked that these serious concerns be communicated to Father Graham.

43. Because of these concerns, Deters requested and advised Xavier not to conduct a hearing on the alleged incident until his Office had completed its investigation. The request was made directly by Deters to Father Graham.

44. For fear that it would once again alienate OCR, and because of Father Graham's own political concerns, Xavier ignored Deters' request and advice.

***The UCB's Fundamentally Unfair Hearing***

45. On August 2, 2012, the UCB held a hearing regarding the allegations against Wells.

46. Despite mandating a preponderance of the evidence standard in a student disciplinary hearing involving allegations of rape or sexual assault, the Handbook does not state whether the complainant or the respondent has the burden of proof.

47. In his opening remarks at the beginning of the hearing, UCB Chairman Brother Darrell Burns did not state whether the complainant or the respondent had the burden of proof in adjudicating the allegations against Wells.

48. The UCB impermissibly placed the burden on Wells to prove his innocence. Despite no evidence of any assault of any kind, the UCB required Wells to offer proof that his sexual intercourse with Rogers was consensual.

49. The Members of the UCB had received woefully inadequate training to handle such matters.

50.     For example, no member of the UCB was trained to understand or interpret a sexual assault evidence collection kit.

51.     Xavier provided Wells with an advisor.  Wells' advisor was a faculty member who had never previously advised a student in a proceeding before the UCB and had no training for his advisor role.

52.     During the hearing, Wells truthfully testified that: (1) the sexual intercourse was consensual; (2) Rogers never said "no" at any point during their encounter; (3) Wells was sober on the evening in question; and (4) Wells could never rape a woman in light of the fact that his sister was a victim of rape.

53.     Xavier Title IX Coordinator Kathy Riga stated that there was "no trauma noted" during a medical examination of Rogers after the alleged incident.  Riga failed to inform the UCB that the medical examination evidenced that no sexual assault had occurred.  Riga also inaccurately stated Xavier had not yet received laboratory testing results analyzing whether any trauma had occurred.  The laboratory testing evidenced that no sexual assault had occurred.

54.     As part of her July 30, 2012 Investigation and Report, Riga admitted that she was "not trained to evaluate" the evidentiary report that revealed Rogers had not suffered any trauma. Despite Riga's lack of training and qualifications, the UCB failed to call any person with any expertise or experience in interpreting rape kits or handling such matters.

55.     No member of the UCB was trained to understand the evidence that would show whether rape or any type of sexual assault had occurred or had not occurred.  The UCB failed to call any trained expert witnesses who could have interpreted the results of the medical examination and would have informed the UCB that no rape or sexual assault had occurred.

56. At the same time, the UCB also rejected and otherwise ignored the Prosecuting Attorney's Office's findings that no rape or sexual assault had occurred.

57. Rogers spoke with Kara Pierson, a close friend, in the hallway shortly after leaving Wells' room. Pierson had participated in the "truth or dare game" in Wells' room. If there were a "shout out" witness, that person was Pierson. Rogers did not express any concern at all when she spoke with Pierson. Pierson testified that Rogers was "okay" when they spoke. Rogers waited ten days to tell Pierson about the alleged assault. The UCB ignored these facts.

58. Despite a prohibition against character witnesses, the UCB permitted Rogers to present several witnesses who presented character evidence but who were not able to provide any evidence that should have been admissible.

59. For example, a letter from Fay Coleman, a University representative and Rogers' direct supervisor while Rogers was a Resident Advisor, was read into the record. Coleman provided no admissible evidence and served only as a character witness.

60. The UCB prohibited Wells from introducing character testimony despite having permitted Rogers to present character witnesses.

61. When a witness for Wells explained, "I just don't see [Wells] being someone that would force himself on somebody else," a UCB member ordered the witness to "stick to the facts." Another UCB member echoed the comments, stating "[w]e can't do character statements."

62. Another Wells witness explained that he knew Wells is "not [the] kind of person" who could commit the alleged act. A UCB member scolded the witness, declaring that witnesses "can't give character statements."

63.     Wells also was precluded from introducing witnesses who would have testified that Rogers had an infatuation with several members of the basketball team and had previously had sexual encounters with members of the basketball team.

64.     The UCB impermissibly permitted Rogers' friend, Shelby Vaughn, to testify even though Vaughn was not present during any part of the evening and did not talk to Rogers about the alleged assault until after Rogers had already discussed the evening with another person.

65.     UCB members regularly asked leading questions of Rogers and her witnesses, intended to assist in justifying their preconceived notions of Wells' guilt.

66.     On August 3, 2012, without waiting for vital laboratory results, Xavier issued its decision ("Decision") and sent a letter to Wells informing him that he had been "found . . . responsible for rape." Wells was expelled from Xavier.

67.     On or about August 10, 2012, Wells filed a written appeal of the UCB's findings to an "Appeal Board." The Handbook does not permit an in-person appeal.

68.     The Handbook states an appeal and subsequent review will be granted for any of the following reasons:

      a.   There is a denial of the elements of a fair hearing;

      b.   The finding is not supported by the evidence;

      c.   The sanctions imposed can be shown to be arbitrary and capricious; or

      d.   There is new information to present that was not available at the time of the hearing, and that may have a bearing on the original decision.

69.     The Handbook states an Appeal Board will determine whether to grant or deny an appeal request based on the following standard: "Does the appeal provide sufficient justification of one of the four reasons set forth in the [Handbook]."

70.     The Handbook provides twenty business days to consider the appeal, presumably to allow for thorough and thoughtful consideration.

71.     The Appeal Board denied Wells' appeal two business days after receipt.

72.     The Appeal Board failed to consider that the UCB denied Wells the elements of a fair hearing, the UCB's finding was not supported by the evidence and the sanctions imposed against Wells were arbitrary and capricious.

***Xavier's Defamatory Press Release***

73.     On August 21, 2012, Xavier announced Wells' expulsion in a written statement. ("Statement.")

74.     Xavier's full Statement reads as follows:

> The Xavier University Conduct Board (UCB), made up of faculty, students and administrators, found Xavier sophomore and basketball player Dezmine Wells responsible for a serious violation of the Code of Student Conduct. The punishment for the violation is expulsion from the University. While we understand there is heightened interest in this situation because it involves a student-athlete, we must reiterate that first and foremost Xavier's interest and responsibility to all of our students is to provide a quality education in a safe and nurturing environment. A serious violation of Xavier's Code of Student Conduct will not be tolerated. All Xavier students are subject to the same protections and consequences. Because of Federal privacy law restrictions, no additional comments may be made in order to protect the privacy of those involved, and to honor the integrity of the UCB process.

75.     The Statement was widely publicized via print, television, and online news and sports media outlets, including Xavier's athletics website.

76.     To this day, Xavier maintains that Wells sexually assaulted Rogers.

77.     Upon information and belief, Rogers has recanted her story and admits that the sex with Wells was consensual.

*Prosecutor Refuses to Press Charges*

78.     On August 28, 2012, Deters announced a grand jury sitting in Ohio had declined to charge Wells with any crime.

79.     Deters commented on his office's findings and openly questioned Xavier's decision to expel Wells:

> We always take allegations of this nature very seriously. I assigned senior assistant prosecutors to this case to review all of the evidence and to conduct a complete presentation to the Hamilton County Grand Jury. After this office conducted an independent review of all of the evidence, it was presented to a Grand Jury yesterday. The Grand Jury declined to charge Dezmine Wells with any criminal offense. I have nothing but the greatest respect for Xavier University, and in particular Fr. Graham. I would sincerely hope the institution would revisit this situation.

80.     Deters also called Xavier's investigation "fundamentally unfair" and emphasized that "there is something flawed with a procedure where a young man and his accuser appear before a group of people, which I would suggest probably isn't well trained in assessing these types of cases, and they sit there and tell their stories. No lawyers, no nothing. There's just something wrong with that."

81.     Deters, a vocal advocate for aggressive prosecution of violent criminals, stated, "If I thought [Wells] did this, he'd be in prison. I wouldn't pull any punches."

82.     Deters further explained that he is "not known as soft on crime by any stretch of the imagination," but he also is "very sensitive of people being accused of things where it doesn't even reach anything close to a standard of proof that [the district attorney's office] would even think of accepting."

*Wells Leaves Xavier*

83.     On September 4, 2012, Wells announced that he was transferring to Maryland.

84.     National Collegiate Athletic Association ("NCAA") bylaws require a student-athlete transferring from one Division I member institution, such as Xavier, to another Division I member institution, such as Maryland, to wait one academic year before being eligible to play intercollegiate sports.

85.     In light of the extraordinary circumstances and the injustice imposed on Wells by Xavier's fundamentally unfair treatment, the NCAA granted a waiver from its bylaws and permitted Wells to play with the Maryland men's basketball team immediately.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF
(Breach of Contract)

86.     Wells repeats and re-alleges the allegations set forth in paragraphs 1 to 85 as if fully set forth at length herein.

87.     The Handbook is a valid, binding and enforceable contract between Xavier and Wells.

88.     The Handbook is and was supported by valid consideration.

89.     Wells fully complied with all of his obligations under the Handbook.

90.     Xavier breached its obligations under the Handbook by, *inter alia,* conducting a fundamentally unfair hearing, improperly placing the burden of proof on Wells, failing to have UCB members properly trained and prepared to adjudicate a sexual assault allegation, failing to involve in the hearing someone competent to testify about the rape kit's findings, not providing Wells with a competent advisor, rushing to a final judgment of Wells before receiving the full laboratory results and Deters' findings, ignoring Deters' requests to delay a final judgment until he could complete his investigation and making irrational, prejudicial and improper decisions about which witnesses could and could not testify. Xavier also did not limit repetitive testimony,

discussion or witness material.

91.    Wells has incurred, and will continue to incur, significant damage as a direct result of Xavier's breaches of the Handbook in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
(Intentional Infliction of Emotional Distress)

92.    Wells repeats and re-alleges the allegations set forth in paragraphs 1 to 91 as if fully set forth at length herein.

93.    Xavier acted in a shocking, outrageous and extreme manner by, *inter alia*, conducting a flawed investigation, refusing to consider exculpatory evidence, refusing to adhere to – or even consider – the information, guidance and advice of trained professionals in the District Attorney's Office or to seek assistance from trained professionals in the medical community and holding a fundamentally unfair and flawed hearing resulting in a Decision that permanently damages Wells.

94.    As a direct and proximate result of Xavier's actions, Wells has been publicly humiliated, and felt ashamed, emotionally distraught and violated.  The conduct of Xavier demonstrated the intent to cause, or disregard of a substantial probability of causing, Wells severe emotional distress.

95.    Xavier's actions were a direct and proximate cause of Wells' severe emotional distress.

96.    Wells has incurred, and will continue to incur, significant damage as a direct result of Xavier's breaches of the Handbook in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF
(Libel Per Se – Injury to Personal Reputation)

97.    Wells repeats and re-alleges the allegations set forth in paragraphs 1 to 96 as if

fully set forth at length herein.

98.    Xavier's Statement concerned Wells and was false.

99.    Xavier's Statement was widely published and not privileged in any manner.

100.    Xavier's Statement was made with reckless disregard of its truth or falsity and/or with malice.

101.    Xavier's Statement was libelous per se because it imported a charge of an indictable offense involving moral turpitude and injured Wells' personal reputation.

102.    Xavier's Statement forever falsely taints and permanently damages Wells as a student who was expelled from his university for a rape that did not occur.  Wells has worked his entire life to develop his personal standing.

103.    Xavier's Statement permanently damages Wells' personal reputation in Ohio and across the country.

### FOURTH CLAIM FOR RELIEF
(Libel Per Se – Injury to Athletic and Professional Reputation)

104.    Wells repeats and re-alleges the allegations set forth in paragraphs 1 to 103 as if fully set forth at length herein.

105.    Xavier's Statement concerned Wells and was false.

106.    Xavier's Statement was widely published and not privileged in any manner.

107.    Xavier's Statement was made with reckless disregard of its truth or falsity and/or with malice.

108.    Xavier's Statement was libelous per se because it imported a charge of an indictable offense involving moral turpitude and injured Wells' athletic and professional reputation.

109.    Xavier's Statement forever falsely taints and permanently damages Wells as a

15

student who was expelled from his university for a rape that did not occur. Wells has worked his entire life to develop both his personal standing in the community and his basketball abilities. Xavier's Statement permanently damages Wells' athletic reputation in Ohio and across the country. Wells will eventually graduate from college and will likely face difficulties in obtaining employment as a result of Xavier's actions and false and defamatory Statement, or, alternatively, professional basketball teams will be more hesitant to sign Wells as a result of Xavier's actions and false and defamatory Statement.

### FIFTH CLAIM FOR RELIEF
(Libel – Reckless Disregard/Malice)

110.　Wells repeats and re-alleges the allegations set forth in paragraphs 1 to 109 as if fully set forth at length herein.

111.　Xavier's Statement concerned Wells and was false.

112.　Xavier's Statement was widely published and not privileged in any manner.

113.　Xavier's Statement was made with reckless disregard of its truth or falsity and/or with malice.

114.　Xavier's Statement and conduct have caused Wells to suffer severe emotional distress.

115.　Xavier had no reasonable grounds for believing the truth of its Statement. Xavier relied on, at best, hearsay, circumstantial evidence and lies in making the Statement.

116.　Xavier failed and refused to consider exculpatory evidence.

117.　Xavier's Statement forever falsely taints and permanently damages Wells as a student who was expelled from his university for a rape that did not occur.

118.　Xavier's Statement permanently damages Wells' reputation in Ohio and across the country.

## SIXTH CLAIM FOR RELIEF
(Libel Per Quod)

119.    Wells repeats and re-alleges the allegations set forth in paragraphs 1 to 118 as if fully set forth at length herein.

120.    Xavier's Statement concerned Wells and indicated the existence of other facts which are defamatory.

121.    Xavier's Statement was widely published and not privileged in any manner.

122.    Xavier's Statement was made with reckless disregard of its truth or falsity and/or with malice.

123.    Xavier's Statement was libelous per quod because it was not reasonably subject to an innocent interpretation and consisted of words that reasonably created a false implication.

124.    Xavier's Statement forever falsely taints and permanently damages Wells as a student who was expelled from his university for a rape that did not occur.

125.    Wells suffered special damages because Xavier's statement forced Wells to expend substantial funds to take informational visits to other NCAA member institutions and eventually to move to the University of Maryland.

## SEVENTH CLAIM FOR RELIEF
(Vacatur of the Arbitration Decision)
(Arbitrator's Partiality)

126.    Wells repeats and re-alleges the allegations set forth in paragraphs 1 to 125 as if fully set forth at length herein.

127.    Pursuant to the Ohio Arbitration Act ("OAA"), Ohio Rev. Code Ann. § 2711.10(B), the Court is empowered to vacate an arbitration decision when "there was evident partiality . . . on the part of the arbitrators."

128.    The Decision should be vacated because the UCB improperly placed the burden

on Wells to prove that a sexual assault did not occur, failed to involve in the hearing someone competent to interpret or clarify the rape kit findings, permitted the complainant's witnesses to establish character evidence in contravention of the Handbook's policies, forbade Wells from introducing character evidence, asked leading questions of Rogers' witnesses to fit – and fill the holes in – Rogers' story, rushed to a final judgment of Wells before receiving complete laboratory results and Deters' findings, ignored Deters' requests to delay a final judgment until he could complete his investigation and made irrational, prejudicial and improper decisions about what witnesses could and could not testify.

### EIGHTH CLAIM FOR RELIEF
(Vacatur of the Arbitration Decision)
(Arbitrator's Misconduct)

129.    Wells repeats and re-alleges the allegations set forth in paragraphs 1 to 128 as if fully set forth at length herein.

130.    Pursuant to the OAA, Ohio. Rev. Code Ann. § 2711.10(C), the Court is empowered to vacate an arbitration decision when "the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced."

131.    The Decision should be vacated because the UCB improperly placed the burden on Wells to prove that a sexual assault did not occur, failed to involve in the hearing someone competent to interpret or clarify the rape kit findings, permitted the complainant's witnesses to establish character evidence in contravention of the Handbook's policies, forbade Wells from introducing character evidence, permitted Rogers to call witnesses who were not proper witnesses, asked leading questions of Rogers' witnesses to fit – and fill the holes in – Rogers' story, rushed to a final judgment of Wells before receiving complete laboratory results and

Deters' findings, ignored Deters' requests to delay a final judgment until he could complete his investigation and made irrational, prejudicial and improper decisions about what witnesses could and could not testify.

132.     The UCB's misconduct prejudiced Wells by resulting in a fundamentally unfair hearing, a Decision finding Wells responsible for a rape that did not occur and an unjustified expulsion.

## NINTH CLAIM FOR RELIEF
(Violation of Title IX – Erroneous Outcome)

133.     Wells repeats and re-alleges the allegations set forth in paragraphs 1 to 132 as if fully set forth at length herein.

134.     Title IX prohibits discrimination on the basis of sex in a school's "education program or activity," which includes all of the school's operations.  20 U.S.C. §§ 1681(a), 1687.

135.     Xavier receives federal financial assistance and is thus subject to Title IX.

136.     In virtually all cases of campus sexual misconduct, the accused student is male and the accusing student is female.

137.     Xavier has created an environment in which Wells, an accused male student, was fundamentally denied due process as to be virtually assured of a finding of guilt.  Such a biased and one-sided process deprived Wells, as a male student, of educational opportunities on the basis of sex.

138.     As a direct result of its discriminatory practices, Wells was denied a fundamentally fair hearing, the UCB reached an erroneous outcome and Wells has been damaged in an amount to be determined at trial.

## TENTH CLAIM FOR RELIEF
### (Violation of Title IX – Deliberate Indifference)

139.    Wells repeats and re-alleges the allegations set forth in paragraphs 1 to 138 as if fully set forth at length herein.

140.    Father Graham had actual notice of the irresponsible, improper and sexually-biased manner in which the allegations against Wells were being investigated and adjudicated.

141.    Father Graham, despite having the authority to institute corrective measures to stop the misconduct, was deliberately indifferent to the misconduct.

142.    Father Graham's deliberate indifference was motivated by Wells' gender. In light of Xavier's history of mishandling sexual assault allegations, Father Graham sanctioned, tolerated and endorsed procedures and policies which effectively deprived Wells, a male student accused of sexual assault, of his right to a fair hearing.

143.    As a direct result of Father Graham's deliberate indifference, Wells has been damaged in an amount to be determined at trial.

## ELEVENTH CLAIM FOR RELIEF
### (Negligence)

144.    Wells repeats and re-alleges the allegations set forth in paragraphs 1 to 143 as if fully set forth at length herein.

145.    Xavier owed Wells a duty to exercise reasonable care to avoid foreseeable injury.

146.    Xavier breached its duty to Wells by, *inter alia*, conducting a fundamentally flawed investigation, failing properly to analyze and consider the rape kit's findings, rushing to a final judgment of Wells before receiving the full laboratory results and Deters' findings, ignoring Deters' requests to delay a final judgment until he could complete his investigation and making irrational, prejudicial and improper decisions about which witnesses could and could not testify

and expelling Wells without any legitimate grounds to do so.

147.     As a direct and proximate result of Xavier's actions, Wells has been damaged in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Wells seeks judgment as follows:

148.     Awarding Wells compensatory damages for the injuries he has suffered, including consequential and incidental damages, as a result of Xavier's wrongful conduct in an amount to be determined at trial;

149.     Awarding Wells special damages in an amount to be determined at trial;

150.     Awarding Wells punitive damages in a just amount for Xavier's willful and wanton conduct;

151.     Awarding Wells pre-judgment and post-judgment interest;

152.     Vacatur of the August 21, 2012 Decision;

153.     Awarding Wells his costs, expenses and attorney's fees incurred in connection with this action; and

154.     Awarding Wells such other relief as the Court finds just and proper.


Dated: New York, New York                    Respectfully submitted,
      September 10, 2013
                                        PETER R. GINSBERG LAW, LLC


By:  s/ Peter R. Ginsberg_____
     Peter R. Ginsberg, *pro hac vice*
     12 East 49th Street, 30th Floor
     New York, NY 10017
     (646) 374-0030
     pginsberg@prglaw.com
     *Attorneys for Plaintiff*

CARR & SHIVERDECKER

By: <u>s/ Merlyn D. Shiverdecker</u>___
    Merlyn D. Shiverdecker
    817 Main Street, Suite 200
    Cincinnati, Ohio 45202
    (513) 651-5652
    carrshiverdecker@yahoo.com
    *Attorneys for Plaintiff*